## CREW *et al. v.* HUTCHESON, ordinary, for use, etc.

1. A money judgment for permanent alimony in favor of a wife against her husband, payable in monthly instalments beginning after the expiration of five years from the date of their marriage, does not bar an action by her against him and a surety upon a bond given under section 388 of the Penal Code. (All the Justices concurring, except LEWIS, J., absent.)

2. The liability of the principal obligor and his surety on such a bond is not affected by wrongful conduct on the part of the wife after the marriage, the husband being bound to maintain and support her and her offspring during the period fixed by the bond, without reference to her behavior. It was in the present case proper for the trial judge, ex mero motu, to decline to

allow the defendants to sustain by proof a defense based upon alleged misconduct on the part of the wife.  (Per LITTLE, FISH, and COBB, JJ.)

3. The plaintiff in an action upon such a bond is not entitled to recover an amount greater than that which would have been sufficient to adequately support the wife and her offspring, if any, for the period or periods elapsing before the bringing of the suit during which support was withheld.  (Per SIMMONS, C. J., LUMPKIN, P. J., and LITTLE, J.)

Submitted November 11, 1901.— Decided June 7, 1902.

Action on bond.  Before Judge Janes.  Haralson superior court. July 20, 1901.

*W. R. Hutcheson* and *E. S. & G. D. Griffith,* for plaintiffs in error. *Edwards & Ault,* contra.

LITTLE, J.  Thomas A. Hutcheson, as ordinary of Haralson county, brought an action for the use of Cora Della Crew, "formerly Della Shelnutt," against S. F. Crew as principal, and M. J. Crew as surety, upon a bond in the sum of $750, which they, in pursuance of a requirement made under the Penal Code, § 388, had executed on the 17th day of August, 1895.  This bond was made payable to J. W. Kelley, ordinary of said county, and his successors in office, and its condition was that "the said S. F. Crew shall maintain and support the said female, the said Della, and her child or children, if any, for the period of five years."  The petition alleges that she and S. F. Crew were married on the day last mentioned; and the 4th paragraph thereof reads as follows:  " Your petitioner further shows that the said S. F. and Della lived together as man and wife from the time of their marriage, as aforesaid, until the first of August, 1897, when the said Della was compelled to flee from the home of the mother of the said S. F., by reason [of] the imhuman and cruel treatment of the said Della by the said S. F. Crew.  The said S. F. Crew refused to support and maintain the said Della as his wife, and compelled her to work and support herself at the home of his mother, the said M. J. Crew.  He cursed and abused her, and procured his mother, the said M. J., to do the same; and, as above stated, she was compelled to flee to the home of relatives for protection and support."  The 5th paragraph of the petition contains an averment that the defendants are indebted to the plaintiff, "for the use of the said Cora Della Crew, . . the sum of six hundred dollars for her said support and maintenance for the period of five years from the date of said marriage to the

present date," and prays for a judgment in that sum. There is in the petition no allegation of the existence of a child at the time of the bringing of the action. The petition was filed about four years after the marriage, and apparently it was the idea of the pleader that the defendants were, under the bond for $750 covering a period of five years, chargeable at the rate of $150 per annum, thus making $600 for the four years indicated. The 4th and 5th paragraphs of the defendants' answer are as follows: "Par. 4th. Plaintiff C. D. Crew and the deft. S. F. Crew lived together as man and wife until the time alleged in this paragraph; all of the balance of the 4th paragraph is every word untrue. Par. 5th. The fifth paragraph is untrue. Defts. are not indebted to said usee one cent whatever for support. She was well supported and cared for while she remained at the home of said deft. M. J. Crew, and she left said home of her own accord, without any wrong treatment from these defendants whatever. Defts. believe and charge, from what they have since learned, that said usee was persuaded by her mother and others to leave deft. S. F. Crew and sue him on the bond now sued on. Defendant further says that he at all times treated her as well as he was able, and at no time did he give her any cause to leave him and stay as she has, and at one time after she left he went to Yorkville, in Paulding county, to get her to return home, and she refused to see him at all, her sister stating to deft. that she would not return. Deft. also wrote two letters to said usee to return, and she refused to return. Defts. therefore ask to be discharged with their reasonable costs."

The case was called for trial on the 20th day of July, 1901. After the parties had announced ready, and a jury had been stricken, the defendants filed an amendment to their answer, in which they set up, in substance, the following facts: On the 19th day of July, 1901, the plaintiff's usee, upon a suit for divorce and permanent alimony, which she had previously instituted against S. F. Crew, obtained a second verdict granting her a total divorce. This verdict also embraced a finding in favor of the plaintiff in that suit for "the sum of $6.00 per month as permanent alimony to be paid as follows: $6.00 on the 1st of each month during her single life, beginning 1st day of August, 1901." A judgment in accord with this verdict was duly entered July 20, 1901. After setting forth these facts, it was in the amendment alleged that inasmuch as the

suit for permanent alimony and the action on the bond in this case were "for one and the same thing, both being for support and maintenance of the said usee Cora D.," and she had "elected to proceed with said application for permanent alimony instead of insisting on her rights, if any she had, under the bond sued on in this case," the right of the plaintiff to recover therein had become barred, and accordingly the present action should abate, for otherwise there would be two judgments in favor of the plaintiff's usee upon one and the same cause of action. It appears that this amendment was not only offered, but actually filed in the office of the clerk; and the court, on motion of plaintiff's counsel, passed an order striking the same. The case then proceeded to trial. The plaintiff put in evidence the bond sued on, but offered no testimony. There was an admission by the defendants that after the separation the husband contributed nothing to the wife's support. The court, of its own motion, refused to allow the defendants to introduce any evidence to sustain their original answer, and directed a verdict for the plaintiff for $600. To all of the rulings indicated above the defendants excepted.

1. As will have been observed, the marriage took place on the 17th day of August, 1895. The period of five years covered by the bond therefore expired on the 17th day of August, 1900. The judgment requiring S. F. Crew to pay permanent alimony to Mrs. Cora D. Crew at the rate of six dollars per month expressly postponed the beginning of the monthly payments until the 1st day of August, 1901. Accordingly, it is obvious that the period during which it was contemplated that the wife should be supported by these payments embraced no part of the period as to which the bond was operative. While it is true that the suit for permanent alimony was begun before the five years expired, it is to be noted that the defendants to the action on the bond did not set up as a defense thereto the pendency of the proceeding for permanent alimony. Had they done this, an altogether different question would have been presented. As the present case stood when the amendment to the defendants' answer was actually filed, not only had a judgment already been rendered for permanent alimony, but the same on its face showed that it gave to Mrs. Cora D. Crew no recovery whatever for that period of time during which the bond entitled her to demand a support from S. F. Crew. It is therefore

clear, we all think, that the amendment set up no good defense, and that the court did right in striking it on motion of the plaintiff's counsel.

2. In the case of *Duke* v. *Brown*, 113 *Ga.* 310, this court held: "The undertaking of the principal obligor and the securities in such a bond is not at all dependent upon the conduct of the female after the marriage. He must maintain and support her and her offspring for the period fixed in the bond, without reference to her conduct." Three of us still adhere to the view then entertained as to this point. It appears from the record now before us that the defendants in their answer set up as a defense alleged misconduct on the part of the wife. This defense was not challenged either by demurrer or by a motion to strike the same, but at the trial the court, of its own motion, declined to allow the defendants to introduce any evidence in support thereof. In pursuing this course his honor below was evidently endeavoring to follow the ruling made by this court in the case just cited, and a majority of us think that this was eminently proper. In support of this view it is only necessary to refer to what is said with respect to this question of practice in the opinion filed in the present case by Mr. Justice Cobb.

3. It only remains for the writer to briefly discuss the question dealt with in the third headnote. Did the facts appearing warrant the direction of a verdict for $600, the full amount for which the plaintiff sued? This action of the court was doubtless predicated upon the ruling in *Duke* v. *Brown*, that: "In such a suit, if it be shown that there has been a breach of the bond, the recovery shall be for the full amount stated in the bond, and the 'judgment shall remain open and be subject to be appropriated' by the ordinary 'from time to time as the situation and exigencies' of the wife and her offspring may require." Of course, if the court could properly direct a verdict for $750, the amount named in a bond of this character, when the petition prayed for a recovery of that amount, it was not, as to the defendants in the present case, harmful error to direct a verdict for the smaller amount of $600, which was all the plaintiff claimed. A majority of us are, however, now satisfied that the ruling last above quoted was not well considered, and should not be followed. The conclusion that in an action of the present nature any breach of the bond would authorize a recovery

of the full amount therein named was reached by analogizing the provisions of sections 388 and 389 of the Penal Code with those embraced in section 1254 of that Code, which deals with a bond given in a bastardy case, and in terms authorizes the rendition of a judgment for "the full amount of the bond, which judgment shall remain open, and be subject to be appropriated by the courts, from time to time, as the situation and exigencies of the bastard child may require." After again carefully and anxiously going over the whole matter, three of us are now convinced that we erred in taking the view above pointed out. The difficulty is that section 389 of the Penal Code does not in terms authorize a recovery of the full amount named in the bond, upon a mere breach of the same. This section simply declares that "upon the failure of the defendant to comply with its terms, suit may be brought thereon." The almost universal rule is that in actions upon penal bonds the recovery can in no case exceed the actual amount of the damages proved. An exception is made, as has been seen, in the case of a bastardy bond; but there is no such exception in the law providing for the giving of the bond required by section 388 of the Penal Code.

To be perfectly frank and candid, therefore, it now seems to us that the ruling on this point in the case of *Duke* v. *Brown* was more in the nature of legislation than of judicial construction. We therefore feel that it would not be proper to adhere to the same. The truth is, we undertook by construction to cure an omission in legislation. It would, we think, have been entirely proper for the General Assembly to declare that in an action upon a bond of the sort now before us, there might, under conditions so authorizing, be a recovery of the whole amount named in the bond even for a slight breach thereof, with a provision, as in the case of a bastardy bond, that the courts might, by appropriate orders passed from time to time, administer the fund raised by the judgment for the benefit of the beneficiary or beneficiaries of the bond. Such legislation should, however, be so framed as not to permit a full recovery when there was palpably no necessity for it. For instance, if a husband has fully and adequately supported his wife for four years and eleven months, it would hardly do to allow the ordinary to recover $750 for the support due but not furnished for the remaining month of the five years. Perhaps the best legislation which could be had on this line would be to allow several distinct

recoveries on the bond, from time to time, as the exigencies of the case might require. Impressed by the idea that the legislation should have gone further than it did, the court was led into the error which we are now undertaking to correct. Another reason which influenced us was, that, in the absence of any such provision as that last suggested, the wife, in a case like the one before us, would, by bringing her suit when the first breach of the bond occurred, be compelled to accept as final a recovery equal only to the amount required for her support during the period or periods when the same had not been furnished up to the time of the bringing of the action, which would, of course, in many cases, be less than the full amount named in the bond; or else wait until the expiration of the five years, and then in a single action recover the full amount of the bond or so much thereof as it then appeared she was entitled to receive. Neither of these alternatives seemed just or adequate to the situation; and this being apparent, we were, under the influence of a strong and proper desire to afford adequate protection to all women who had thus been mistreated, misled into an attempt to accomplish that for which the lawmaking power should have provided. We still adhere to the spirit of the decision made, and are firmly convinced that the law on this subject should be amended; but, for the reasons given above, we are now constrained to hold that the ruling announced was not authorized by the law as written.

There being in the present case no evidence warranting a finding for the plaintiff in any particular sum, the trial judge was not, in the opinion of a majority of us, authorized to fix the amount of the recovery.

*Judgment reversed. All the Justices concurring, except Lewis, J., absent, and Fish and Cobb, JJ., dissenting.*

LUMPKIN, P. J., speaking for himself and the Chief Justice, concurring specially. While we concur in the judgment of reversal, we are unable to agree to the conclusion reached by our brethren that the court below was right in refusing to allow the defendants to prove the allegations of their original answer, to the effect that Mrs. Cora D. Crew voluntarily and without sufficient excuse abandoned her husband's home, and that while she remained there he had provided her with an adequate support. The only reason which can be suggested for holding that this answer did not set up a good defense, and one which it was proper to allow the de-

fendants to sustain by competent testimony, arises from the ruling made by this court in the case of *Duke* v. *Brown*, that "The undertaking of the principal obligor and the securities in such a bond is not at all dependent upon the conduct of the female after the marriage." We are, after mature deliberation, convinced that the language just quoted does not set forth a correct rule of law ; and the same is not binding as authority, because the case just referred to was not decided by a full bench of six Justices. It is not only the policy of the law that a woman who has been betrayed and seduced shall, when the author of her ruin evades the punishment of his crime by taking her in marriage, be supported by him for the five years ensuing next after the date of the marriage, but it is also no less its policy to discourage separations between husband and wife, and to encourage their living together in peace and harmony. It is the duty of the courts to effectuate, as far as they can possibly do so, both of the legal objects outlined above. The seducer, if he escapes the penitentiary by marrying his victim, should, it is true, be compelled to take care of her, and he should bear the punishment of being compelled to do so, if punishment it be, without being heard to complain. This salutary principle should, however, be qualified by requiring, as a condition of her support and maintenance, that the wife shall with reasonable good faith and fidelity conform to the duties resting upon her in the conjugal state. As the law stood for a long time, a prosecution for seduction could "be stopped at any time by the marriage of the parties, or a bona fide and continuing offer to marry on the part of the seducer." See Code of 1882, § 4371. That the lawmaking power did not, in employing the language just quoted, contemplate the mere empty form of a marriage, or intend to allow the seducer to escape punishment by tendering to the woman a fraudulent offer to marry with the sole design of escaping conviction, is evidenced by two considerations: (1) It can not be supposed that there would be such trifling with so serious a matter; and (2) for the manifest purpose of preventing just such an improper use of the above-quoted provision as we have just indicated, the General Assembly in 1893 passed an act amending the law. The design of this act was to no longer permit the abatement of prosecutions for seduction by marriages which were such in form only. All of this was very plainly pointed out by Mr. Justice Cobb on pages 313

and 314 of the volume cited. It being clear, then, that the legislative intent was that a marriage between the seducer and his victim should be entered into in good faith, there is every reason for holding that the parties thereto should be mutually bound to perform the obligations and duties usually incident to the contract of marriage. The great object which the legislature had in view was, not to afford the seducer a pretext for evading punishment, but to bring about a marriage which would tend as far as possible to enable him to atone for a great wrong, and relieve society of the evils which must necessarily flow from the crime of seduction whenever perpetrated. If, therefore, a woman entering into matrimony under such conditions is to be permitted to violate ad libitum her marriage obligations, disregard her duties as a wife, and conduct herself in such a manner that even a truly repentant seducer could no longer cherish for her those sentiments which ought to animate the bosom of every good husband, and at the same time compel him to support her, it is plain that the sound public policy referred to above, which seeks to preserve domestic happiness and prevent unseemly separations between husbands and wives, would be destroyed. It was certainly not in legislative contemplation that a marriage brought about by a prosecution for seduction should, when entered into, be a marriage of a different kind, or one having different incidents, from marriages contracted under usual and ordinary circumstances. On the contrary, it was designed that the marriage between the seducer and the woman he had led astray should be bona fide, and that it should, as nearly as possible, place these two in the same position they would have occupied after an honorable courtship ending in matrimony. It is to be noted that the seducer is not required to support his victim as such, but as his wife. The law does not undertake to provide for an injured and disgraced woman, but for one who has forgiven and become a wife. She ought, then, in order to be entitled to support, to be a wife in fact, at least to the extent of observing those duties and obligations which are to be justly expected from every woman who takes the vows of marriage. As has been seen, the statute is designed to encourage marriages between seducers and their victims, to the end that past wrongs may be atoned for and society benefited. To construe the statute to mean that a woman who marries her seducer owes him no marital duties whatever would certainly tend to deter a wrong-doer, who

is really repentant and ready to repair his wrong, from offering the protection of marriage to the woman he had betrayed; and thus the object of the statute would be in a large measure defeated. A man with knowledge that such was the law might well prefer the penitentiary to a married state of such an anomalous character that, while it imposed upon him all the burdens of matrimony, his wife (who was so in name only) would be free to abandon him at pleasure and even live a life of open shame. In passing upon the case of *Duke* v. *Brown*, we overlooked these considerations, being led to do so by the righteous indignation with which all right-thinking men are inclined to regard the conduct of one who deceives a trusting woman and leads her to her ruin. We are prompted to take the view we now announce, not because of sympathy for seducers, but because, after further reflection, we can not escape the conclusion that in laying down the rule announced in that case this court took a step too far in the direction of destroying the sanctity of marriage contracts, and in establishing a precedent the following of which would tend to defeat the principal object which the legislature had in contemplation when passing the above-mentioned act of 1893. As we think the defendants' answer set up a perfectly good defense, and that they ought to have been allowed to support it by competent evidence, it is unnecessary for us to express our views upon the question of practice dealt with in the opinions filed by Mr. Justice Little and Mr. Justice Cobb.

COBB, J., speaking for himself and Mr. Justice Fish. We concur in the conclusions stated in the first and second headnotes, but we can not agree to the proposition laid down in the third headnote, and we therefore are constrained to dissent from the judgment rendered in the case. We do not desire to add anything to what has been said by Mr. Justice Little in support of the proposition laid down in the first headnote, but will state the reasons why we concur in the ruling made in the second headnote and dissent from that contained in the third headnote. The case of *Duke* v. *Brown*, 113 *Ga.* 310, was in all its aspects very carefully considered, at least by the writer, and the conclusions reached therein in reference to the questions which were directly raised in the record, as well as those which were discussed in the course of the opinion, were not by any means the result of a hasty examination of the case nor a cursory review of the law supposed to be applicable to those questions.

That the case presented questions difficult of solution was thoroughly and fully appreciated, and there was no desire or inclination to deal with the case in any other way than by the exercise of a patient and conscientious effort to arrive at a correct solution of the questions involved, although the writer was painfully conscious of the fact that in determining the questions involved no precedents were in sight to be pointed to as in any way upholding or sustaining the conclusions there reached. Any one reading what is there said can not but be aware that there was at the time a keen appreciation, on the part of the writer, of the difficulties then encountered, and an earnest effort to construe the act then under consideration so as to carry out the intention of the General Assembly and make the act effective for the beneficent purposes for which it was passed. It is now said that, at least so far as one of the points involved in that case is concerned, the ruling there made partakes more of the nature of judicial legislation than of judicial construction. It did not so appear to us then, or the judgment would never have been rendered. It does not so appear to some of us now, even after the lapse of time and additional reflection and examination into the question. To some of us it appears now that what was there said on the point in question was subject to the criticism above referred to. To those who take this view of the question no other course is open than to refuse now to follow the ruling there made. When a court becomes satisfied that it has in the past usurped functions which properly belong to another department of government, it should not continue in the path of usurpation; and if any member of the court becomes conscientiously satisfied that in the past usurpation has taken place, it is the duty of that member, notwithstanding his brethren and associates may disagree with him, not only to refuse to further engage in the usurpation but to put upon record his reasons for not concurring with his brethren in what appears to him to be a palpable usurpation of authority. What is said in the opinion in *Duke* v. *Brown*, it still seems, ought to be sufficient to support the conclusions therein reached; but, in addition to what is therein said, other views tending to support these conclusions will be now stated.

When the General Assembly passed the act now contained in the Penal Code, § 388, which provided that a prosecution for seduction could be stopped by the marriage of the parties and the giving by

the defendant of a bond to the ordinary, conditioned to support the female and her offspring for a period of five years, the purpose of the legislature, as was pointed out in *Duke* v. *Brown,* was to protect the female who was the victim of the seduction. The act was not passed for the purpose of showing any mercy or consideration to the seducer, but the conspicuous figures in the legislative mind were the wronged female and her offspring. The past had demonstrated that seducers had availed themselves of the privilege afforded by the law of marrying their victims, not from any conscientious regard of duty or desire to make reparation, but solely to evade a sentence imposing a term of penal servitude; and while the law contemplated that the parties should become bound in the bonds of matrimony, it also contemplated that, in addition to the usual remedies which were given to require a performance on the part of a husband of the obligations he had assumed to support and maintain his wife and children, the husband who married the woman whom he had betrayed, under circumstances where it was apparent that the marriage was contracted simply to avoid the punishment prescribed by law for the crime of seduction, should be bound with stronger bands than the ordinary husband to support his wife and children. It is true that the relation of husband and wife exists between these parties, but this relation is not brought about by the voluntary act of the husband or as the result of a virtuous courtship. The wife that the seducer thus takes in order to avoid the penalty of the law is not to be held to the high standard of the virtuous woman who marries an honorable man. The woman is not a virtuous woman, and the man is not an honorable man; and this fact was in the legislative mind when the act was passed, and must be kept in the judicial mind in arriving at what was the intention and what was the scope of the act passed by the lawmaking power. The husband at the date of the marriage is not only not a man who can be described by the term "honorable," but he is a confessed felon, and enters into the bonds of matrimony, not with a pure and holy purpose, but with the same motives which would prompt a savage to surrender to authority when no other course was open to him. Such a man marrying the victim of his crime has not the right to expect of her the same conduct that an honorable man would expect of a virtuous wife. She was a virtuous woman once. He has deprived her of the right to stand before the world and demand the

rights that a virtuous woman would be entitled to. He has not only betrayed her and destroyed her, but has compelled her to resort to the publicity of a public trial in order to make him repair as best he can the wrong that he has committed. She would be more than human if such an experience had any other effect than to blunt altogether her sensibilities. When he takes her to wife he knows that he takes to wife a woman whose sensibilities are presumptively all gone, and that he is responsible for her being in this condition. Even in any marriage the husband takes the wife for better or for worse; but in a marriage of the character now under consideration the husband can be presumed to know that he takes the wife for worse under all circumstances, because the conditions are not favorable for the other alternative of married life. With a full knowledge of the fact as to what he has done, and what effect he has wrought upon the life and character of the woman, he takes her to wife and becomes bound to maintain and support her. If she is wilful, he must remember that he is responsible probably for the development of this trait of character; if she is wayward, he must not forget that it was through him that she was led into the paths of the wayward; if she is vicious, this should be only a reminder to him that her first lesson in vice was learned under his instruction; if she is lawless, he must not lose sight of the fact that it was from him she received the first suggestion that caused her to disregard law both human and divine. His obligation is to support and maintain the wife he has married, not the ideal wife that the honorable man would expect to find in a pure woman whom he had led to the altar after a virtuous courtship.

After the maturest reflection and the most earnest consideration, no other conclusion can be now reached than that it was not the intention of the General Assembly, in the passage of the act requiring a bond to be given for the support and maintenance of the wife before a prosecution for seduction could be stopped by a marriage, that it should ever become a question for a jury to determine whether the wife had behaved in such a way as to forfeit her right to a support from her husband. This question is concluded by the bond; and no matter how the wife conducts herself after marriage, the obligation of the bond is to support and maintain her, and this obligation must be complied with. Hard as this may seem, as was said in *Duke* v. *Brown*, it is not nearly so hard as being re-

quired to serve a term of involuntary servitude in the penitentiary of the State. This construction of the law imposes upon the husband, under certain circumstances, a term of servitude, it is true, but a servitude with far less disadvantages and far less severity than a servitude imposed as the result of a conviction for the crime of which, it must never be forgotten, the husband has in open court confessed that he is guilty. Of course the woman may conduct herself in such a manner as to make it impossible for the husband to live with her and comply with all the obligations which the law imposes upon the ordinary husband. This fact was recognized by the General Assembly, and it was not contemplated that it would be possible that parties who had before marriage sustained such relations to each other could after marriage found a home based on mutual esteem and affection, where the chief aim of each of the parties would be the happiness and welfare of the other. It can be confidently asserted, and it must have been known to the members of the General Assembly, that the founding of such a home by such parties was a practical impossibility; and this is the reply to the suggestion that the law had in mind the protection of society. It was undoubtedly contemplated that society should be incidentally protected by the legitimation of the offspring, but the main and controlling purpose of the law was to impose upon the husband the obligation of supplying the wife with the necessities of life. All confessed criminals must be punished, and the punishment inflicted upon a confessed seducer by simply requiring him to support the wayward and wilful victim of his crime is a light penalty compared to what might be imposed upon him except for the leniency of the law in allowing him to marry his victim.

It is contended that as the plea which set up that the failure of the husband to support his wife was due to her conduct was not demurred to, the defendants had a right to introduce evidence in support of the same, and, if the allegations of the plea were proved, were entitled to a judgment in their favor. The defendants offered evidence to establish the truth of the allegations of the plea. This evidence was rejected by the court, and error is assigned in the bill of exceptions upon this ruling. Under the ruling in *Duke* v. *Brown*, the facts stated in the plea constituted no sufficient defense to the action on the bond. The question therefore arises, what is to be done by a court when it appears during the progress of the trial that

the plea relied upon as a ground of defense constitutes no reason for refusing to permit a recovery by the plaintiff? In reference to the plea in the present case, if the rule laid down in *Duke* v. *Brown* is to be followed, there can be no two opinions on the question as to whether the plea constituted a ground of defense. In such a case is the court required to go through the farce of hearing evidence to establish a state of facts which, if true, should not in any view of the law be permitted to defeat the plaintiff's right to recover? Does the mere fact that the plaintiff has passed over, without demurring, the patent defect in the plea deprive the court of the right, at a subsequent stage of the case, to call in question the sufficiency of the plea? Are the hands of the court so tied that it must not only permit evidence to be introduced to establish the truth of a plea which has no foundation in law, but must charge the jury that if they believe these facts to be true they must return a verdict in favor of the defendant, and then, when such a verdict is returned, enter up a judgment thereon? Can it be said that in this enlightened day such a proceeding is required to be carried on in a place where it is supposed that justice is judicially administered, and which is presided over by an intelligent judge aided in his investigations, so far as the facts are concerned, by an upright and intelligent jury? No such result as this was permitted under the rules of the common law, nor is it required by the laws of this State. It is proposed now to establish the proposition just stated.

A demurrer admits the truth of all the matters of fact suficiently pleaded on the other side, but it does not follow from this that the effect of pleading without demurring is to admit the sufficiency in law of the facts adversely alleged. If a party pleaded without demurring, he was held at common law to have waived all defects in the pleading of his adversary which he could not take advantage of by a general demurrer, and all defects in the pleading which were amendable before verdict were cured by the verdict. Perry's Com. Law Pl. 236–7; Ship. Com. Law Pl. 152–3; Steph. Pl. (Andrews' 2d ed.) §§ 141–2; Steph. Pl. (Heard) 146, 149; Martin's Civ. Pro. at Com. Law, § 240; 4 Minor's Inst. (part 2), mar. p. 895 et seq.

If at common law a case proceeded to trial upon an issue formed upon a plea, and it appeared after verdict that the plea set forth no ground of defense and for this reason was fatally defective,

the court upon motion would enter a judgment in favor of the plaintiff notwithstanding the verdict that was rendered against him, provided there appeared either in the plea upon which the verdict was rendered, or in any other plea filed by the defendant, what amounted to either an express or implied confession on the part of the defendant of the plaintiff's right to recover, in the absence of the matter of avoidance which was set up in the plea upon which the verdict was rendered. The judgment non obstante veredicto was allowable upon the theory that the plea itself being substantially bad in law, of course the verdict which merely showed it to be true in point of fact would not entitle the defendant to a judgment; and when the plea upon which the verdict was founded was a plea in confession and avoidance, the judgment was entered in favor of the plaintiff upon the confession of the plaintiff's right to recover, and the matter of avoidance was disregarded, because not sufficient in law to do away with the effect of this confession. Originally at common law the judgment non obstante veredicto could not be entered except in cases where the plea upon which the verdict was rendered was one in confession and avoidance; but subsequently to the statute of Anne, which allowed the filing of several pleas, it was held that although the plea did not confess the cause of action, yet if it was confessed in other pleas, there should be a judgment for the plaintiff. If issue was joined upon a point which was immaterial and upon which it was not proper to decide the action, the effect of a verdict finding against either party on such an issue was relieved against by a motion for a repleader filed by the unsuccessful party. The issue under the common-law system of pleading was always upon some question raised between the parties, and which by the course of the pleading was mutually agreed upon as one proper to decide the controversy. After the issue of fact thus made was decided, it might appear that the issue thus raised and agreed upon by the parties was one upon which the controversy should not or ought not to have been determined; this state of affairs having been brought about by one of the parties having, from misapprehension of the law or oversight, passed over, without demurring, a statement of the other side insufficient and immaterial in law. Under the common-law system of pleading, with all of its strictness, a case would not be allowed to be determined upon an irrelevant or immaterial issue, although for the time being the par-

ties had agreed by their course of pleading that such an issue would properly determine the case. Notwithstanding the fact that the case was made to turn upon an immaterial issue was the fault of the parties, the law allowed a remedy when this fact was ascertained, and permitted the court to remedy the absurdity of making the case turn on an insignificant and immaterial point, by awarding a repleader in the case. It was said that a repleader should never be granted to the party who made the first fault in pleading, but to that suggestion Tindall, C. J., once answered, "A repleader is rather the act of the court, where it sees that justice can not be done without adopting that course." See Gordon v. Ellis, 7 M. & G. 607.

If a plea was so defective that it ought to have been stricken on general demurrer, and the defendant succeeded at the trial, and the plea confessed the action, the plaintiff was entitled to a judgment notwithstanding the verdict. If the plea was fatally defective and should have been stricken on general demurrer because the matter alleged was so foreign or immaterial to the controversy, and the plea did not contain a confession of the plaintiff's cause of action, and the verdict was for the defendant, the issue raised on the plea was not allowed to decide the controversy between the parties, but a repleader was awarded in order that the parties might, by readjusting the pleadings, arrive at a material issue upon the determination of which the court would be justified in giving judgment for the one or the other. See, in this connection, Ship. Com. Law Pl. § 161 – 2; Steph. Pl. (Heard) *97 et seq.; Gould, Pl. 494 – 6; Steph. Pl. (Andrews' 2d ed.) § 127 (3, 4); 1 Chitty, Pl. *686 et seq.; Perry's Com. Law Pl. 212 et seq.; Martin's Civ. Pro. at Com. Law, §§ 371 – 2; 4 Minor's Inst. (part 1) 771 – 5; 2 Tidd's Pr. *921 – 2; Harris v. Goodwyn, 2 M. & G. 434; Goodburne v. Bowman, 9 Bing. 532, 23 E. C. L. Rep. 369, 373; 11 Enc. P. & P. 912 et seq.; 18 Enc. P. & P. 490 et seq.; Bouvier's Law. Dict. (Rawle's Rev.) tit. Judgment, subtit. Classification; Id. tits. Non Obstante Veredicto and Repleader. An examination of the authorities just cited will show what course was pursued under the common-law system of pleading where, on account of the fault of one or the other of the parties to the case, a piece of bad pleading was passed over without objection being taken thereto by demurrer, and after issue joined and verdict rendered the court was confronted with a con-

dition of affairs where, if judgment was entered in accordance with the verdict, the party in whose favor the verdict was entered would be allowed a judgment which would either be unfounded in law, or which would be founded upon an issue which did not and ought not to have really determined the controversy between the parties. Under such a state of facts, what was to be done ? If the verdict rendered was against the party who had committed the first fault in pleading, or against the party who had negligently or ignorantly overlooked the defect in his adversary's pleading, it might be said that he should lose the case as a penalty for his ignorance or negligence, as the case might be. Dr. Minor, in his Institutes (vol. 4, part 1, mar. p. 774), in discussing the question as to whether a repleader ought to be granted in favor of the party who committed the first fault in pleading, uses this language: "Doubtless, if the pleaders only were to be considered, it might be proper to punish their remissness in this way. But whilst the court is visiting upon the parties the *laches* of their counsel, what is it to do in respect *to its own judgment?* Is the judge to stultify himself by pronouncing a judgment upon grounds irrelevant and immaterial?" Chief Justice Tindall seems to have entertained the opinion also that on this question the court owed something to *itself* and the integrity of its proceedings and judgments, as well as the rights of the parties to the controversy. This is manifest from the language quoted above from him in the case of Gordon *v.* Ellis.

In Ex parte Pearce, 80 Ala. 195, where it appeared that a verdict in favor of the defendant could not be supported except upon pleas which were insufficient, an award of a repleader was affirmed, notwithstanding it was held that this remedy was not technically the correct one to be employed in that case. The court in the opinion (p. 199) say: "The result of the trial and verdict in this case was a manifest injustice to plaintiffs. The defenses set up were without merit, and the court would have been justified in setting the verdict aside *ex mero motu*, and allowing the pleadings to be amended. We will not say it was not the duty of the court to do so. One of the chief purposes for which courts are organized is, that, while observing the dividing line which separates the duties of the judge from those of the jury, the presiding judge should exert his powers in favor of legal justice." In Gerrish *v.* Train, 3 Pick. 124, the Supreme Court of Massachusetts lay down the rule

to be, that if after issue found the court is at a loss how to give judgment, a repleader will be awarded on the motion of either party.  Decisions can be found in those States where the system of common-law pleading once prevailed, as well as in those States where that system now prevails, which show that the principles of common-law pleading are still recognized, and that it is a general rule that a judgment which is manifestly improper, if not illegal, will not be entered simply for the reason that one or the other of the parties to the case has ignorantly or negligently omitted to take advantage of the defect in the pleading of his adversary.  The distinction between the motion for a judgment non obstante veredicto and the motion for a repleader is, that the first is always founded upon something involving the merits of the controversy, and the latter is generally founded upon something affecting the form or manner of the pleading; though there are some rulings which indicate that a motion for a repleader might be made in any case where it would have been manifestly wrong for a judgment to be entered upon the verdict rendered, for the reason that it did not decide the real issue between the parties.  If the defendant pleaded in confession and avoidance and sustained his plea by proof, and it appeared upon a retrospection of the pleadings that the matter pleaded in avoidance constituted no defense to the action, the finding in the defendant's favor of course amounted to nothing; and if objection was made to the judgment in his favor, the court would not stultify itself by entering a judgment in favor of the defendant simply because a matter alleged which was not sufficient to defeat the action was found by the jury to be true in fact.  It would be useless in such a case to make a motion for a new trial, for the reason that the purpose of this motion is to set aside a verdict which is in the way of the movant, and a verdict of the character above indicated, when construed in the light of the pleadings, ought not to be in the way of anybody.  The court therefore upon motion would disregard such a verdict; and as the pleading of the defendant amounted to a confession of the plaintiff's cause of action, in the absence of the matter of avoidance set forth in the plea, judgment would be entered in favor of the plaintiff as upon this confession.  If the defendant's plea was a traverse of the allegations of the plaintiff's petition, and issue was joined on this plea, and the plea found in favor of the defendant, of course a judgment

for the defendant could be entered if such a verdict was consistent with the law and the pleadings; and if the evidence at the trial did not support the denial contained in the defendant's plea, the plaintiff had a remedy by motion for a new trial to set aside the verdict on the ground that the evidence did not sustain the plea, it being good in substance. If the parties joined issue upon a matter which was immaterial to the real merits of the controversy and therefore a matter which should not be allowed to determine the question as to who should prevail in the case, the effect of a finding upon this immaterial issue was avoided by a motion for a repleader, which if granted would require the parties to start the pleading anew at the point where the first fault in pleading was made, in order that an issue might be raised which would decide the real merits of the controversy.

It seems from what has been above stated that when a motion of this character was filed, it called into exercise the powers of the court not only to do substantial justice between the parties, but also to give such direction to the case as would prevent a judgment from being entered which would be a reflection upon the integrity of the court and the administration of justice. In those States which have adopted a code of practice, while the motion for a judgment non obstante veredicto and the motion for repleader are not preserved by name, there is in the codes of such States a recognition of the fact that the same condition of affairs which brought into existence at common law the two remedies is likely to arise; and when this condition of affairs arises in the code States, there is a remedy provided to accomplish the same purpose which was accomplished by the common-law motions above referred to, that is, to prevent the court from rendering a judgment which would be manifestly wrong and improper and one which would be calculated to bring into discredit the courts as the organs of the administration of the law. If the complaint be sufficient, the plaintiff may apply for a judgment on the pleadings, if the defendant has filed an answer which expressly admits the material facts stated in the complaint, or where the answer merely sets up new matter and is found substantially insufficient. 3 Estee's Code Pl. § 4604; 11 Enc. P. & P. 1030 et seq.; 2 Bates, Code Pl. 968. A frivolous answer will, in all of the code States, be stricken on motion, although it seems that the Missouri code only expressly provides for so doing. Bliss,

Code Pl. (3d ed.) § 421; 3 Estee's Code Pl. § 4610.  In Hemme *v.*
Hays, 55 Cal. 337, it was held that a frivolous answer is one which
denies no material averment in the complaint and sets up no de-
fense, and when such an answer is filed the plaintiff may apply for
a judgment on the pleadings.  In the opinion Sharpstein, J., said:
" Where an ' answer presents nothing, either by way of denial or
new matter, to bar or defeat an action,' the plaintiff may apply for
judgment upon the pleadings."  See also Montgomery *v.* Merrill,
62 Cal. 385; Felch *v.* Beaudry, 40 Cal. 439.  In Strong *v.* Sproul,
53 N. Y. 498, Allen, J., says: " A frivolous answer is one so
clearly and palpably bad as to require no argument or illustration
to show its character, and which would be pronounced frivolous
and indicative of bad faith in the pleader upon a bare inspection;
and when such an answer is interposed and alone delays the plain-
tiff in obtaining the judgment to which he is clearly entitled, judg-
ment is authorized to be given upon a summary application on a
notice of five days."  In the case of Lough *v.* Bragg, 18 Minn.
121, the Supreme Court of Minnesota recognizes that a motion for
a judgment upon the pleadings under the code system is equivalent
to the motion for a judgment non obstante veredicto at common
law.   In that case, the defendant having obtained a verdict upon a
plea in confession and avoidance, the plaintiff moved for a judg-
ment notwithstanding such verdict; and it was held that, as the
answer contained no valid defense to the action and confessed the
execution of the note sued on, the motion should have been granted,
it appearing that the judgment moved for would be a judgment
upon the merits and not upon the form of the pleading.  Mr. Black
in his work on Judgments (vol. 1, § 16) recognizes that while in
many of the States the motion for a judgment non obstante vere-
dicto and the motion for a repleader are not retained in form as
specific remedies, there is, under the practice of nearly all the
States, a remedy of some name which accomplishes the same pur-
pose which was accomplished by these motions at common law.
See also, in this connection, 1 Freeman, Judg. (4th ed.) § 7.

There is no reference in our code by name either to the motion for
a judgment non obstante veredicto or the motion for a repleader.  As
the motion for a repleader was generally applicable at common law
in cases where there had been an immaterial issue made up and joined
at some stage of the case subsequently to the plea, that motion in

form would have very little application to our system where there is, except in special cases, no pleading after the answer of the defendant. There seems to be no ruling by this court which expressly recognizes the motion for a judgment non obstante veredicto as a remedy eo nomine in this State. Such a motion was made in the case of *Grant* v. *Insurance Co.*, 76 *Ga.* 575. While it was held in that case that the motion was not well taken, there is nothing in what is said by the court, either in the headnote or the opinion, to indicate that that motion or one which would be the same in substance would not be an appropriate remedy in Georgia, if the facts of the case were such as to call for its exercise. In Georgia the forms of the common-law pleading have been abolished, but the substance has been retained. While in other States where codes have been adopted there are prescribed forms of procedure, there is in our code nothing requiring adherence to any particular form in judicial proceedings. An examination of the laws of procedure in this State, from the judiciary act of 1799 down to and including the uniform procedure act of 1887 and its various amendments, will demonstrate that the efforts of the legislatures which have from time to time dealt with the subject of procedure in this State have been to bring about a system where the litigant would not be hampered by prescribed forms, but where the controversies between the parties at issue would be determined by the court and justice administered according to the facts of the cases as they appeared in the pleadings of the parties, and the parties be given a decision upon the merits of the controversy. Wherever this result could be accomplished by an adherence in substance to the remedies of the common law, these remedies are still applicable in this State. They need not be designated by any name, but if there was a remedy at common law which would bring about the desired result when applied in this State, the courts can still administer such remedies, no matter whether they call them by any particular names or not. If in a particular case the law and the facts demand that a judgment should be entered on the merits of the case in a particular way, and there is no precedent either at common law or in the past in this State for such a case, under our system the court may frame a remedy and give the case such direction as justice demands and the law and the facts of the case authorize. If at common law, where the court was hampered by a system of procedure which was replete

with strict rules and technical niceties, the court was authorized to protect itself from rendering a judgment which was palpably erroneous and manifestly wrong, and would be in violation of the principles of law and do great injustice in the particular case, notwithstanding the condition of affairs that thus confronted the court was brought about by the negligence or ignorance of the litigants or their counsel, much more under our loose system of procedure, which looks alone at substance and ignores form, would the court be authorized, if not required, to take such steps as might be necessary in order to demonstrate that courts are places where justice is judicially administered and controversies are decided upon their merits.

If the plaintiff files a petition which sets forth a cause of action, and the defendant files an answer thereto which would be equivalent to a plea in confession and avoidance at common law, and instead of demurring to the answer the plaintiff goes to trial, and the issue made by the answer is found in favor of the defendant, we know of no good reason why this verdict should not be set aside upon motion made during the term at which the verdict was rendered, upon the ground that the plea was bad in substance, or why a new trial should not be granted in order that the pleadings might be amended and the bad plea stricken from the record, even if it would not be proper in such a case for the judge to ignore the matter of avoidance in the plea which was bad in substance, and enter a judgment in favor of the plaintiff upon the petition as confessed. Certainly when the attention of the court is called to the fact that a judgment is about to be entered in favor of the defendant, simply because a plea which was bad in substance, and which would be held to be frivolous and unfounded in the code States, had been found to be true by the jury, the court would have a right to disregard the plea upon a motion to set aside the verdict, or it may be upon a motion for a new trial; or if either of these remedies be not appropriate under our system, then to frame such a remedy as would prevent the court from entering a judgment which could have no other effect than to bring the court into discredit and the administration of the law into contempt. Such a judgment was never permitted at common law when a timely motion was made to disregard the finding upon the insufficient plea. Such a judgment can not now be entered in any of the code States in this Un-

ion, when a timely motion for a judgment on the pleadings is made. Certainly, in a State where the claim is made that substance only is looked to in judicial proceedings, such a judgment can not be entered when timely objection is made to its rendition. If the court could at common law protect itself from entering such a judgment after verdict, then it would necessarily follow that under our system the court would have a right to stop the trial at any time before verdict, when its attention is called to the fact that the plea is bad in substance, and that even if found true it would not legally authorize a judgment in favor of the defendant, and take some steps, either by striking the plea or directing a verdict, which would have the effect not only of preventing the necessity of entering a judgment upon a bad plea but also the necessity of proceeding with a trial which would result in no other way than in a finding which would have to be subsequently disregarded by the court. If the court can disregard the plea after verdict because the same is bad in substance, either by setting aside the verdict which is based thereon, or by granting a new trial, or by taking such other steps as would have the effect of preventing a judgment from being entered on the finding in favor of the plea, then the court during the progress of the trial can take any proper and necessary steps required to prevent a finding upon the plea which is bad in substance. This may be accomplished either by striking the plea, if a motion is made to this effect, by ruling out evidence which is offered in support of the plea, or, if evidence has been admitted, by directing a verdict for the plaintiff, notwithstanding the plea and the evidence offered in support thereof. A plea which does not set forth anything which is in law a sufficient reason for defeating the right of the plaintiff to recover upon a petition which sets forth a cause of action should not, even if proved to be true, be allowed to have the effect to defeat the plaintiff in his right to recover, provided the plaintiff calls attention to the fact that the plea is bad in substance, during the progress of the trial before verdict, or makes a timely motion after verdict to disregard the verdict finding in favor of the plea; and this is true notwithstanding the plaintiff has passed over the plea which was bad in substance without demurring to the same prior to the trial.

It is well settled in this State that if a petition does not set forth a cause of action, the court can relieve itself of the necessity of ren-

dering a judgment in favor of the plaintiff on such a petition, by dismissing the same at any time during the progress of the trial, when its attention is called to the fact that the petition is. bad in substance. This can be done either upon motion of the defendant or by the court upon its own motion. If the petition sets forth a cause of action, and the plea and answer thereto set up no ground of defense whatèver, we see no good reason why under our system the court at any time before verdict should not give the case such direction as would disregard the plea, and do this either upon motion of the plaintiff or upon its own motion. This practice is entirely in accord with the theory of our system, which is that a verdict and judgment in a case should, so far as possible, decide the actual merits of the controversy between the parties and do substantial justice between them. Of course, if the answer was good in substance and was simply defective in form, the court would have no authority to disregard the same either on the motion of the plaintiff or otherwise, for the reason that by failing to demur the plaintiff has waived all defects of form in the answer. Keeping this in mind, none of the rulings of this court are in conflict with the position above taken. In *Bryan* v. *Gurr*, 27 *Ga.* 378, it was held that where a plea of justification had not been demurred to for insufficiency, and evidence had been admitted under it without objection, it was error for the court to charge the jury that the plea was defective, and the defendant could take nothing under it. An examination of this case will show that the plea, though informal and defective, was good in substance, and of course in such a case the plaintiff by failing to demur waived the formal defects in the plea, and the court should have treated the plea as good for the purposes of the case. In *Siesel* v. *Harris*, 48 *Ga.* 652, it was held that when the defendant filed a plea of usury which was good in substance but otherwise defective, and there was no demurrer to the plea, it was error for the court to charge that the jury could disregard the plea for the reason that it did not contain all of the essentials necessary to make a perfect plea of usury. There was nothing said in either of these two cases as to the right of the court to instruct the jury to disregard the plea if it had been altogether bad. In *Henderson* v. *Fox*, 83 *Ga.* 233 (3), it was held that a plea of justification, although loose and informal, which was not demurred to, would not be very closely scrutinized after verdict. Neither in England after the stat-

ute allowing pleadings to be amended, nor in the code States, was the court authorized to disregard, either before or after verdict, a plea which was good in substance but defective in form; and that is the extent only of the rulings just referred to. There is no ruling, so far as we have been able to ascertain, which in terms denies to the court the right to disregard a plea bad in substance before verdict, or after verdict if a timely motion is made to that effect, notwithstanding the failure of the opposite party to raise the question of the sufficiency of the plea by a general demurrer to the same.

There is nothing in the position above taken which conflicts with the rulings of this court, that the legal sufficiency of a petition can not be called in question by a motion for a nonsuit, or by objection to evidence, or by a motion for a new trial. In the case of *Fleming* v. *Roberts*, 114 *Ga.* 634, which followed the previous rulings of this court, it was held that the legal sufficiency of a petition can not be brought in question by an objection to evidence introduced in support of the same. It was there said: "If a petition is good in substance but defective in form, objection to it must be made by an appropriate special demurrer at the first term; if a petition is not good in substance, that is, taking every allegation to be true, it fails to set forth a cause of action, objection must be made to it either by a general demurrer or a motion to dismiss the case before verdict, or by motion in arrest of judgment or motion to set aside the judgment after verdict. We know of no other way in which the legal sufficiency of a petition can be properly brought before the court." It will thus be seen that where the defendant passes over a petition bad in substance without demurring, he is given three remedies by which he may call in question the sufficiency of the petition, one before verdict and two after verdict; one of these latter being recognized by the common law, that is, a motion in arrest of judgment; the other two, the motion to dismiss before verdict and the motion to set aside after verdict, being peculiar to our system. The legal sufficiency of a declaration could not be called in question at common law on a motion for a new trial, and it can not be called in question by such a motion in this State. The legal sufficiency of a plea in confession and avoidance which was bad in substance, but which had not been demurred to, could be called in question at common law by a motion after verdict to enter a judgment notwithstanding the verdict, or in certain cases

by a motion for a repleader. There being very few, if any, cases where the motion for a repleader would be applicable under our system of pleading, it follows that if the motion for a judgment notwithstanding the verdict is not in substance still of force in this State, we have abolished the only remedy known to the common law which would be applicable under our system, and substituted no remedy in the place of this salutary common-law remedy which was abolished. The negligent or ignorant defendant who fails to demur to the petition is given, under our system, the motion to dismiss, available to him at any time before verdict, and there is retained for his benefit the common-law motion in arrest of judgment. Is the ignorant or negligent plaintiff to be punished more severely than the ignorant or negligent defendant? If we have retained the motion in arrest of judgment as a remedy for the defendant, why not retain also the motion for judgment notwithstanding the verdict, for the benefit of the plaintiff? If we have created a new remedy for the defendant by motion to dismiss pending the trial, why not recognize the necessity for a similar remedy for the plaintiff, and give him a right to move to strike the plea or disregard the plea, or any other motion which would have the effect, during the progress of the trial, of disposing of a plea which was altogether bad in substance? A motion to exclude the evidence, or a motion to direct a verdict, would have the same effect; and in justice it seems that the plaintiff should be entitled to remedies of this character, where similar remedies are given to his adversary under circumstances where he would be as much at fault as the plaintiff would be. In the present case the plea confessed the truth of the allegations in the petition. It in effect admitted the execution of the bond and the failure to support the wife. It set up as a reason why the defendant was not liable on the bond, notwithstanding the facts charged in the petition were true, that the wife had voluntarily abandoned the husband and the failure to support her was due entirely to her conduct. Under the ruling in *Duke* v. *Brown*, this constituted no reason for the failure to support the wife, and therefore was no defense to the action on the bond. If this plea had been proved and the jury had returned a verdict finding in favor of the defendant on this plea, this finding would have been upon an issue which could not have legally decided the controversy between the parties. The finding should

either have been disregarded or set aside. Such being the case, when it appeared to the court during the progress of the trial that the plea was bad in substance, and, if found in favor of the defendant, the court should have refused to enter a judgment thereon, it was not only the right but it was the duty of the court to give the case such direction as that the plea would be disregarded. This was done in the present case by refusing to allow evidence to sustain the plea. The same result could have been accomplished by allowing the evidence and directing a verdict against the defendant. In any event the right result was reached, and the judgment, so far as this question is concerned, should be affirmed.

In all that has been said Mr. Justice Little agrees with us. In what follows we speak only for ourselves.

In this case the bond was for $750, but for some reason the suit was brought for only $600. The court directed a verdict in favor of the plaintiff for the full amount sued for. It having appeared that the husband failed to support the wife, under the ruling in *Duke* v. *Brown* the plaintiff was entitled to recover the full amount of the bond, if this amount had been sued for; and under that ruling he was entitled in the present case to recover the full amount for which the suit was brought. It is insisted that the ruling in *Duke* v. *Brown* was erroneous, for the reason that there is nothing in the statute authorizing a judgment for the full amount stipulated in the bond; and that therefore suits upon bonds of this character should be governed by the ordinary rules of the common law, and the plaintiff should be permitted to recover only such damages as the proof shows she had sustained prior to the filing of the petition. The general rule is that in a suit upon a penal bond, whether the amount recovered is the full penalty or not, all remedies on the bond are merged in the judgment, and no further suit can be brought on the bond. The act in reference to the bond given for the purpose of stopping a prosecution for seduction provides that the bond shall be filed in the office of the ordinary and recorded, and, upon the failure of the principal obligor to comply with the bond, suit may be brought thereon. Penal Code, § 389. The statute does not in terms say what should be the amount of recovery on the bond. The question thus arises, whether it was within the contemplation of the General Assembly that one recovery, say for a failure to support the wife for one day, of an infinitesimal amount would have

the effect to prevent another recovery on the bond for a failure to support during a period of two, three, or five years. As the statute does not in terms provide that successive recoveries may be had upon the bond for continued default on the part of the husband to support the wife, the better view seems to be that the General Assembly intended that one suit only should be brought upon the bond. Such being the case, could this suit be brought the moment there was a failure to comply with the terms of the obligation, and the full amount of the bond be recovered as a penalty, the fund thus going into the hands of the ordinary to be disbursed by him for the benefit of the wife and her offspring, having a due regard for what had been done by the husband in the way of supporting his wife before the suit or what might be done thereafter during the continuance of the five years; or was the wife compelled to wait until the expiration of the five years, and live as best she might during that term, and then bring a suit which would reimburse her for the cost of her living during the period that her husband had failed to support her? It must be kept in mind that the legislative purpose and intent was to provide for the maintenance and support of the wife, and the act must not be construed in such a way as to defeat this end. If it is held that no suit can be brought until after the expiration of five years, except for such an amount as may be necessary to pay for the support during the time that the husband may have failed to support the wife prior to the suit, or that a suit brought within five years must be limited so as to authorize a recovery only for an amount necessary to support the wife during that part of the period of five years which had expired before the bringing of the suit, then the legislative purpose, to provide for the support of the wife for the full period of five years, although not entirely defeated, is, to a large extent, disregarded.

To hold that a suit brought during the five years was limited to the actual damages sustained up to the time the suit was brought would not carry out to its full extent the legislative purpose. To hold that the wife must wait until after the expiration of the five years, if she expected to demand of her husband and the security on his bond the full amount necessary to support her for the entire period, would not be at all in furtherance of the legislative scheme. The purpose, as has been stated more than once, of the General Assembly was to provide for the maintenance and support of the wife

for the period of five years, and the amount necessary for this purpose was to be fixed by the ordinary when the bond was given, and the wife was entitled to look to the bond for such a part of this sum as was necessary to support her during that portion of the period of five years that the husband failed to support her. No other course was open to the court in passing upon the act and determining what was intended to be accomplished by the General Assembly, keeping in view the purpose and intent for which the legislation was passed, than to hold that the failure for any period of time to support and maintain the wife constituted a breach of the bond, and that when such breach took place it was the duty of the public officer who was the custodian of the bond to bring a suit thereon, and recover the full amount of the bond. Any other view than this is not only inconsistent with the purpose and intent of the legislation under consideration, but tends to defeat the wise and beneficent ends intended to be accomplished by that legislation. But it is said, as it was said in *Duke* v. *Brown,* that the act does not in terms authorize this. This must be conceded. While we can not look to other legislation for the purpose of carrying into effect a piece of defective legislation, we can look to other legislation indicating the purpose and policy of the State, in order to determine what was the legislative intent in dealing with a matter similar to that already dealt with by previous legislation, and construe the terms of the act in the light of prior legislation on a subject of a somewhat similar nature, and in this way give to the act a construction which is clearly in line with the legislative intent indicated therein, and which will further the wise purposes which are manifested by the terms of the act, when taken in the light of past history which had its effect in bringing about the legislation in question. The legislation on the subject of the remedies to be given on bastardy bonds was therefore, in *Duke* v. *Brown,* resorted to in order to throw some light upon the question as to what was to be the remedy upon the bond given in cases of the character now under consideration. It was not contended in *Duke* v. *Brown,* neither is it contended now, that there is any express legislation authorizing a recovery of the full amount of the bond in a suit of the character before us; but it was contended then, and it is contended now, that in no way can the legislation contained in the sections of the Penal Code above cited be carried into full effect,

unless so construed as to allow in a given case a recovery for the full amount stated in the bond. Any other construction would not only be not consistent with the scheme as dealt with in the act, but would seriously tend to defeat the entire purpose for which the legislation was passed.

The bond given by the seducer to stop the prosecution for seduction was treated as a bond given to the public, conditioned for the support of his wife; and if he failed to support her, the public, through the public officer who was the payee of the bond, was to recover the amount and see that the same was appropriated for the purpose for which the bond was given. While the question was not directly involved in *Duke* v. *Brown*, nor is it involved here, it was then said (and no reason appears for a modification of what was laid down there, although it may be subject to the criticism that it was obiter) that the ordinary should use the fund from time to time for the support and maintenance of the wife and her offspring, and that if at the end of the period of five years from the date of the marriage any amount remained uncollected on the judgment, or, if collected, remained unexpended in the hands of the ordinary, such amount should be returned to the person who paid the same to the ordinary. The court is now, and was in *Duke* v. *Brown*, confronted with a condition of affairs where under one construction the act providing for the bond to be given by the seducer to support his wife and children could be rendered effective, and under another construction the act would be practically nullified. One construction would make the act a benefit to the victim of the crime; the other construction would simply afford to a confessed felon an opportunity to escape from the obligation to support a once virtuous female whose happiness and character he had destroyed. Between these two constructions it seemed, when *Duke* v. *Brown* was before the court, that that which carried into effect the manifest legislative intent and enured to the benefit of the unhappy victim of the crime was to be preferred to a construction which enured to the benefit of the felon himself, who was out of the penitentiary simply by the mercy of the law, the enforcement of which he was further attempting to defeat by the refusal to comply with the obligation entered into when this mercy was extended to him. After due reflection there appears no good reason why the rule laid down in *Duke* v. *Brown* should not be adhered to. Every

conclusion reached in *Duke* v. *Brown*, after a patient re-examination of that case, is still satisfactory to the writer, and nothing has occurred to his mind, or been presented by any one else in reference to the conclusions there reached, which would require that the same should not be followed in other cases where the questions there discussed are involved. The writer stated in *Duke* v. *Brown* that a great deal of what was there said was obiter, but such portions of the opinion were then deemed to be necessary to a well-rounded discussion of the questions actually involved. The right was expressly reserved to depart from these dicta in the future, if upon further reflection they were not thought to be well founded. The writer now sees no reason to withdraw, restrict, modify, or depart from anything said in the opinion in *Duke* v. *Brown*.